UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA L. WESTEDT,

          Plaintiff,

v.                                       Case No. 15-CV-129

SGT. DARRYL FRANKLIN,

          Defendant.

## ORDER

Plaintiff Joshua Westedt, a Wisconsin state prisoner who is currently confined at Waupun Correctional Institution (Waupun), filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated when defendant Darryl Franklin used force against him during a cell extraction at the Wisconsin Resource Center (WRC). Judge Charles N. Clevert, Jr. (to whom this case was assigned at the time) screened Westedt's complaint pursuant to 28 U.S.C § 1915A(a) and allowed him to proceed with Eighth Amendment claims alleging that Franklin used excessive force during a cell extraction and was then deliberately indifferent to Westedt's serious medical needs. (ECF No. 4.)

The parties subsequently consented to have this court resolve this matter. (ECF Nos. 3, 9.) This case is now before the court on Franklin's motion for summary judgment. (ECF No. 58.) Westedt moved to dismiss his medical care claim, so the court's consideration of Franklin's motion will be limited to Westedt's excessive force claim. (ECF No. 73, 87.)

## I. RELEVANT FACTS

The facts in this section are taken primarily from "Defendants' Reply to Plaintiff's Response to Defendant's Proposed Findings of Fact" and "Defendant's Response to Plaintiff's Proposed Additional Facts." (ECF Nos. 85, 86.) The court will note disputes of fact.

At all relevant times Westedt was confined at the Wisconsin Resource Center (WRC). (ECF No. 85, ¶ 1.) Franklin is employed by the State of Wisconsin Department of Health Services as a Psychiatric Care Supervisor at WRC. (*Id.* at ¶ 3.)

At WRC, Unit F-12 is a housing unit that functions as an open unit and focuses on inmates who suffer from mental illness and inmates who have intellectual issues. (*Id.* at ¶ 13.) Many of the inmates are in a restricted status but have proven their ability to interact appropriately on an open unit. (*Id.*) The goal of Unit F-12 is to reintegrate long term restricted-status inmates back into the general population. (*Id.*) Instead of relying on conduct reports, Unit F-12's program uses a level system to deter misconduct. (*Id.*) Unit F-12 inmates are allowed to move around freely and attend off

unit activities. (*Id.*) Unit F-12's program allows inmates who display misconduct to be secured in their cell instead of being moved to a high management unit. (*Id.*) However, if the inmate's behavior is a risk to security or the inmate continues to have a negative and interfering impact on the unit, he must be moved to a higher security unit. (*Id.*)

On March 9, 2011, at approximately 3:04 p.m., Psychiatric Care Technician – Advanced Alissa Sabel was conducting the 3:00 p.m. census check on Unit F-12 at WRC. (*Id.* at ¶¶ 9, 12.) While Sabel was conducting the census check, Westedt began arguing with another inmate in the dayroom after the other inmate saw Westedt making inappropriate gestures at Sabel. (*Id.* at ¶ 14.) Sabel directed both inmates to stop arguing, but Westedt continued yelling, "Hey man shut the fuck up!" (*Id.*) Sabel and Psychiatric Care Technician Heidi Kloiber both directed Westedt to lock in his room. (*Id.* at ¶¶ 6, 15.) Westedt said, "I'm not locking in!" (*Id.* at ¶ 15.) Westedt was given several more directives to lock in his room, which he refused. (*Id.*) Correctional Officer Mike Natzke ordered all the inmates in the dayroom to lock in. (*Id.* at ¶ 16.) This time, Westedt proceeded to his room and locked in. (*Id.*)

While inmates in Unit F-12 were being led out for recreation, unit staff informed Franklin that Westedt had become disruptive and disrespectful. (*Id.* at ¶ 17.) Staff redirected Westedt to secure back in his cell several times before he complied. (*Id.*) As he locked in, Westedt started yelling at staff, telling them to "fuck off" and calling them "bitches." (*Id.*) When Franklin arrived at Westedt's cell door, Westedt was yelling that

he would kill staff and was calling them "bitch" and "cunts," along with other insults. (*Id.* at ¶ 18.) When Franklin attempted to interject, Westedt focused his anger towards Franklin and called him "bitch." (*Id.*) Franklin avers that Westedt threatened to cause Franklin physical harm and death and said he would return to the WRC parking lot after his release to kill Franklin; Westedt disputes this. (*Id.*)

All attempts to calm Westedt down failed. (*Id.*) Franklin determined that Westedt needed to be moved to a more secure unit, F-11. (*Id.* at ¶ 19.) Unit F-11 is a high security unit where the focus is security and control. (*Id.*) While Unit F-11 does offer some treatment options, it is not considered a long-term housing placement. (*Id.*)

When Franklin informed Westedt that he would be moving to a high security unit, Westedt refused to comply. (*Id.* at ¶ 20.) When asked to comply with directives to place his hands out of the trap, Westedt stated, "Fuck that. Get a suit up team." (*Id.*) Franklin also avers that Westedt told Franklin he was going to kill Franklin and the staff members at the desk and that he would return to the parking lot of WRC to kill Franklin after his release; Westedt denies that he made these threats. (*Id.*)

The purpose of a suit up team is to physically remove an inmate from an area when he refuses to comply. (*Id.* at ¶ 21.) From Franklin's experience, when Westedt said, "get a suit up team," it suggested that he was ready to fight or physically resist the escorting team. (*Id.*)

Franklin attempted to persuade Westedt away from his threats of physical violence by asking "is that really the way you want to leave the unit?" (*Id.* at ¶ 21.) Westedt responded, "yes." (*Id.*) Franklin closed the trap and asked Sergeant Victor Bode to set up a team for entry. (*Id.* at ¶ 23.) As Sergeant Bode walked away from the cell, Westedt decided that he would comply with the transfer to Unit F-11. (*Id.*) As restraints were being placed on Westedt's wrists, he continued to yell and call staff "bitch" and threaten Franklin. (*Id.* at ¶ 24.) Westedt admits that he threatened Franklin but denies threatening any other staff members at this point. (*Id.*) After the wrist restraints were secure, Sergeant Bode directed Westedt to place his hands back in the cell, but Westedt refused and continued to threaten Franklin. (*Id.* at ¶ 25.)

When wrist restraints are placed on an inmate through the trap in the cell door, it causes the inmate to bend over at the waist. (*Id.* at ¶ 26.) To decrease the chance of injuries, staff ask the inmate to stand up as the door opens. (*Id.*) If the inmate keeps his hands through the trap, it could cause the inmate to fall, and it puts added pressure on the inmate's spinal cord. (*Id.*) In addition, some inmates will attempt to grab staff through the trap in the cell door or will resist after they are secured. (*Id.*) If the inmate's hands are inside the door, staff can close the trap and reevaluate the situation. (*Id.*) Also, if the inmate's hands are inside the door, the inmate cannot control the door as staff open it. (*Id.*) The cell doors open outward and weigh approximately 200-300

pounds. (*Id.*) If the inmate's hands are on the door, he can slam it open into staff and cause injuries. (*Id.*)

According to Westedt, he followed the door as Bode opened it and then stood up straight and followed the door about five seconds later. (ECF No. 84 at 2.) Once the door was open, an unknown staff member told Westedt to face the door. (*Id.*) Westedt said, "what" because he did not understand, but was again told to face the door. (*Id.*) Westedt asked why because he was already facing forward, and an unknown staff member slammed Westedt's face into the door. (*Id.*) Westedt swore and called the staff member a bitch; he was then decentralized. (*Id.*)

Westedt admits that he started to resist when staff first started to bring him to the floor because he thought he was being attacked. (ECF No. 84 at 2.) However, he says he complied and allowed himself to be brought to the floor without any further resistance after he was told to stop resisting. (*Id.*) Westedt says that after he was on the ground on his back and fully restrained Franklin choked him. (*Id.*) Franklin's hands were by Westedt's Adam's apple, not his chin, which is why Westedt believes Franklin was not using a mandibular hold. (*Id.*)

Westedt says that he was not fighting with staff or moving any part of his body while Franklin choked him. (ECF No. 84 at 3.) His legs were restrained by another staff member, and his hands were secured with handcuffs that were attached to a waist belt that was secured to the cell door with a tether. (*Id.*) Westedt says that Franklin

continued to choke him until the leg restraints were on and staff started bringing Westedt to his feet. (*Id.*)

Franklin's version of events is very different. Franklin asserts that by the time he went around the door and took center position, using the door to stabilize Westedt was not an option because it was open. (ECF No. 85 at ¶ 27.) This meant that floor decentralization was the last available option to stop Westedt's resistance. (*Id.*) Floor decentralization means that Westedt was directed to the ground in a controlled manner by staff; it is a trained technique. (*Id.* at ¶ 28.)

Franklin says that Westedt continued to resist, his yelling escalated, and he threatened to kill staff. (ECF No. 85 at ¶ 29.) Franklin then took control of Westedt's head and secured a mandibular position. (*Id.*) The mandibular compliance hold focuses on the nerve cluster at the angle of the chin. (*Id.* at ¶ 30.) The hold is designed to cause some discomfort in order to quickly gain compliance from the inmate. (*Id.*) It is used to get the attention of the non-compliant person, not to cause harm. (*Id.*) Franklin asked Westedt if he would comply with directives and stop resisting, but Westedt responded with more expletives and attempted to pull away. (ECF No. 85 at ¶ 29.) Franklin applied pressure in Westedt's mandibular area, and only then did Westedt agree to comply. (*Id.*) Franklin says he used the mandibular compliance hold to stop Westedt from resisting staff and to gain his compliance with directives. (*Id.* at ¶ 31.) Westedt was out of control, he was actively resisting and disobeying orders, and his behavior had

elevated to a dangerous level and someone could have been injured, including Westedt. (*Id.*)

According to Franklin, once Westedt was under control, Franklin told him to follow staff orders. (ECF No. 85 at ¶ 32.) Westedt said he would. (*Id.*) Leg restraints were then applied, Westedt was returned to his feet and escorted toward the exit. (*Id.*) Franklins says that leg restraints are only used during a move if an inmate physically resists; verbal outbursts do not always require the use of leg restraints. (*Id.*)

There is a dispute regarding whether Westedt continued to yell throughout the escort to Unit F-11 and whether he threatened the staff members at the desk and called them "bitches" and "cunts." (ECF No. 85 at ¶ 33.) Per policy, all inmates entering a high security unit must be strip searched to make sure that no contraband enters the secure environment and that the inmate has nothing on him that could be used to cause injury. (*Id.* at ¶ 34.) Westedt refused to comply with the strip search, so the escorting team secured him to his new cell door and performed a staff-assisted strip search at the cell door. (*Id.* at ¶ 35.) During the search, all the windows in the area were covered to provide privacy to Westedt. (*Id.*)

Once Westedt was on Unit F-11, Franklin noticed that Westedt had some small scrapes on his hand. (ECF No. 85 at ¶ 37.) Franklin asked Westedt if he would like to see a nurse and informed medical. (*Id.*) A nurse checked the scrapes Westedt received during the struggle. (*Id.*)

Sabel completed Adult Conduct Report #2207001 on March 9, 2011, charging Westedt with Disobeying Orders, Disrespect, and Disruptive Conduct regarding the incident. (ECF No. 85 at ¶ 44.) Westedt was present at a disciplinary hearing on March 12, 2011, for the conduct report. (*Id.* at ¶ 45.) He was found guilty on all charges and did not appeal the disciplinary hearing committee's decision. (*Id.* at ¶¶ 46-47.)

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III. ANALYSIS

For an excessive force claim under the Eighth Amendment, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

Franklin argues that his use of force was necessary given Westedt's non-compliance with the staff's orders and his resistance. He also asserts that the force used was not malicious or sadistic for the purpose of causing harm. Thus, he contends he is entitled to summary judgment on Westedt's excessive force claim.

Westedt argues that genuine issues of material fact exist as to what occurred on March 9, 2011. He disputes that Franklin used a mandibular hold on him, contending that he was choked by Franklin. He claims that Franklin choked him gratuitously after he was already on the ground, restrained, and compliant. These factual disputes, he argues, preclude the entry of summary judgment for Franklin.

Whether Franklin applied a mandibular hold or choked Westedt and whether Westedt was resisting when Franklin used force are material facts. Genuine disputes exist over those material facts. As such, the court must deny Franklin's motion for summary judgment. The court "do[es] not judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009).

Franklin argues that Westedt's claims are internally inconsistent because Westedt agreed to a proposed finding of fact that states:

> Once they were in control of Westedt's actions, Franklin verbally directed him to follow all staff orders. Westedt stated that he understood and would follow all staff orders. Once they had confirmation from Westedt that he was ready to comply with Franklin's orders, leg restraints were applied, he was returned to his feet, and he was escorted toward the wing end door, exiting the unit. Leg restraints are only used during a move if an inmate becomes physically resistive. Verbal outbursts do not always require the use of leg restraints.

(ECF No. 63, ¶ 33.) Conversely, Westedt submits in a notarized affidavit:

> While Franklin was choking me I was not fighting with staff or moving any part of my body as my legs were restrained by PCT Matschi and my hands were secured with handcuffs that were attached to a waist belt, and the waist belt was secured to my cell door with a tether.

(ECF No. 84, ¶ 17.) The court does not see an inherent inconsistency in these two statements and wonders whether Franklin misinterpreted Westedt's statement that his

legs were being restrained by an officer to mean that the leg restraints had already been applied. Perhaps Franklin wants the court to infer from the fact that leg restraints were applied that Westedt was physically resistive. Either way, the court will not hold Westedt to an admitted fact where his sworn affidavit unequivocally creates disputes of material facts.

The Court of Appeals for the Seventh Circuit has made it clear that "summary judgment cannot be used to resolve swearing contests between litigants." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Nor may the court "weigh the evidence or decide which testimony is more credible." *McCann*, 622 F.3d at 752 (citations omitted). Disputes of material facts preclude the court from granting Franklin's motion for summary judgment.

Franklin also argues that he is entitled to qualified immunity because there is no case law that would support a finding of unconstitutional conduct in Franklin's decision to use the mandibular compliance hold. But there are questions of fact regarding whether Franklin used the mandibular compliance hold technique or choked Westedt. Based on Westedt's version of events, a reasonable jury could conclude that Franklin applied force "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore discipline." *Wilkins*, 559 U.S. at 37.

## IV. CONCLUSION

**WHEREFORE, IT IS HEREBY ORDERED** that Franklin's motion for summary judgment (ECF No. 58) is **DENIED**.

**IT IS FURTHER ORDERED** that the court will hold a telephonic status conference on September 23, 2016, at 10:00 a.m. The court will initiate the call.

Dated at Milwaukee, Wisconsin this 9th day of September, 2016.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge